_____

SHANNON NICOLE GRIFFIN,

                       Plaintiff                         DECISION AND ORDER

-vs-

                                               16-CV-6440 CJS

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                       Defendant.

_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Kenneth R. Hiller |
| | Timothy Hiller |
| | Law Offices of Kenneth Hiller |
| | 60000 North Bailey Avenue, Suite 1A |
| | Amherst, New York 14226 |
| | |
| For the Defendant: | Susan J. Reiss |
| | Social Security Administration |
| | Office of General Counsel |
| | 26 Federal Plaza, Room 3904 |
| | New York, New York 10278 |
| | |
| | Kathryn L. Smith, A.U.S.A. |
| | Office of the United States Attorney |
| | for the Western District of New York |
| | 100 State Street |
| | Rochester, New York 14614 |

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Shannon Nicole Griffin ("Plaintiff") for Supplemental

Security Income Benefits.  Now before the Court is Plaintiff's motion (Docket No. [#7]) for

judgment on the pleadings and Defendant's cross-motion [#13] for judgment on the pleadings.  Plaintiff's application is denied, and Defendant's application is granted.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Court has reviewed the administrative record [#5] and will reference it only as necessary to explain this Decision and Order.

Plaintiff claims to be disabled due to both physical and mental impairments, but it is clear that the physical impairments are not disabling in and of themselves, and merely limit the exertional level at which Plaintiff can work.[1]  The main thrust of Plaintiff's lawsuit is her contention that the ALJ failed to properly evaluate the medical evidence concerning her non-exertional impairments. *See*, Pl. Memo of Law [#7-1] at pp. 23-29.

Exhibits 3F and 11F of the Administrative Record detail Plaintiff's treatment, between January 2010 and September 2014, at the Grace Family Medicine office in Rochester, New York, by her primary care physicians, Matthew Mack, M.D. ("Mack") and William Morehouse, M.D. ("Morehouse").  Exhibit 3F covers the period of January 15, 2010 to November 1, 2012. (201-274).  The office notes relating to this period of approximately three years contain ten references to Plaintiff's mental health, but are concerned primarily with other routine medical issues unrelated to Plaintiff's disability claim.  Notably, every mental status examination performed as part of office visits during

---

[1]*See, e.g.*, Plaintiff's Memo of Law [7-1] at p. 18 (Describing the report of Plaintiff's long-time treating physician, Dr. Matthew Mack,  in pertinent part,  as follows: "He opined that Ms. Griffin could walk 2 city blocks at one time, sit for 60 minutes at one time, and stand for 15 minutes at one time.  Ms. Griffin could stand/walk for about 4 hours in an 8-hour day and sit for at least 6 hours.  She could also occasionally lift twenty pounds."); *see also*, 7/15/13 treatment note of Dr. Mack's PA, Jessica Speares (559) (She filled out forms indicating that Plaintiff could "work 40 hours with no standing or walking more than 4 hours due to knee pain.").

this period was normal. Specifically, the notes concerning such exams routinely stated, "Mental Status: No morbid ideation or overt thought disorder," with some entries adding, "capable of self management." (271). On January 15, 2010, Mack reported that Plaintiff's depression was "improved." (204). On May 26, 2010, Mack noted that Plaintiff was receiving mental health therapy and medication through a different office. (214). On February 23, 2011, Mack reported that Plaintiff's depression was "much stabler" on medication, with less depression and fewer panic attacks. (225). During that same visit, Mack reported that he had filled out disability-related paperwork for Plaintiff, based upon what he had been told by Plaintiff's therapist. (225) ("She brings me DHS papers; her counselor says she isn't yet ready to work . . . I put her down for being able to work [part time]."). Mack's report indicated, in pertinent part, that during the ensuing six months Plaintiff would be able to participate in "work, education or training" for only "5-10 hours per week, with reasonable accommodation." (227). In that regard, when asked to list the factors limiting Plaintiff's ability to work, Mack wrote:

> Avoid work environments of moderate or high [illegible] stress including complex work tasks, or crowded work environments. . . . Anxiety/depression - P[atient] experiences panic attacks occasionally due to stressful situations. Occasionally her depression will cause lack of motivation + isolation about once/month. No suicidal ideation.

(228). On November 15, 2011, Mack reported that Plaintiff had been discharged from mental health therapy after failing to attend appointments, and that she had stopped taking her medication, and had reported "some melt-downs, feeling useless." (231). Mack also noted, though, that Plaintiff expressed interest in resuming both therapy and medication, and that she was "try[ing] to gain employment." (231).

On March 16, 2012, Mack reported that Plaintiff had brought disability forms for him to fill out. (249). However, Mack indicated that he would only fill out the form relating to Plaintiff's physical problems, and that he deferred to Plaintiff's mental health therapist to fill out any form relating to Plaintiff's mental impairments. (249) ("She brings in DHS work determination form. Her only physical limitation is due to L hip pains she has been having; larger limits are 2/2 [secondary to] mental health. She has a MH therapist, and will likely get a MH related DHS form for him to fill out.").

Exhibit 11F consists of Mack's and Morehouse's office notes for the period November 2012 through September 2014. During this period, the office notes contain fewer references to Plaintiff's depression than during the prior three years, and again mainly concern routine medical issues unrelated to Plaintiff's disability claim. Additionally, all of the mental status examinations remained normal. *See, e.g.*, (548) ("Alert. Oriented to person, time, and place. No morbid ideation or overt though disorder and capable of self-management."). Moreover, many of the references to Plaintiff's mental health indicate that her symptoms had improved with medication.

On November 8, 2012, Morehouse reported that Plaintiff had resumed mental health therapy for "explosive disorder," which was "adequately compensated" with medication; Morehouse did not mention any depression symptoms. (543-544). On October 29, 2013, Morehouse reported that Plaintiff was taking Ambien and Trazodone for depression, and seeing a psychiatrist at a different office. (565). Morehouse noted, apparently based on Plaintiff's self-reporting, that she "still ha[d] episodes where her chest becomes tight and she feels [short of breath] with heart palpitations," which "has been associated with depressed mood, anxiety, irritability, panic attacks, insomnia, lack

4

of motivation and poor concentration." (565).  On November 14, 2013, Morehouse reported both that Plaintiff's chest pains had ceased after taking medication, and that her depression had "improved." (569).  On May 23, 2014, Morehouse again reported that Plaintiff was complaining of chest pain, which she attributed to increased "stress recently" (570), though Morehouse apparently attributed her discomfort to a gastrointestinal problem. (571).

Apparently because of such chest pain, Plaintiff was seen in the Emergency Room ("ER") on August 12, 2014, at which time she noted that she had a history of depression and anxiety. (588).  However, the attending doctor reported: "Psychiatric: She has a normal mood and affect.  Her behavior is normal.  Judgment and thought content are normal." (589).

Significantly, on September 22, 2014, Mack conducted a physical examination, and in the course of reviewing Plaintiff's "systems," he stated: "Psych:  She *denies* anxiety, depression, panic attacks, insomnia, memory loss, concentration difficulty, suicidal ideation, increased stress, or hallucinations." (599) (emphasis added).  Mack further noted that Plaintiff had an "appropriate affect." (600).  Plaintiff reportedly told Mack that she was engaged and "trying to get pregnant." (599).

However, despite the fact that Plaintiff had, during her previous appointment, denied any mental health symptoms, and even though he had previously deferred to Plaintiff's therapist to complete any disability paperwork relating to mental health, on October 1, 2014, Mack filled out a disability report that not only addressed Plaintiff's alleged mental impairments, but also indicated that they rendered her incapable of working. (602-605).  In that regard, Mack stated that Plaintiff had problems with

"remember[ing] work-like procedures," "carry[ing] out detailed instructions," "work[ing] in coordination with or proximity to others without being unduly distracted," "mak[ing] simple work-related decision" and "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms," all of which would "preclude performance from 11% to 20% of an 8-hour workday." (603). Further, Mack stated that Plaintiff had a problem with "maintain[ing] attention for two hour segments," that would "preclude performance for more than 20% of an 8-hour workday." (603). Mack continued, opining that Plaintiff had problems dealing with supervisors, problems responding to changes in the workplace, problems dealing with "normal work stress," and problems planning and setting realistic goals, all of which would "preclude performance from 11% to 20% of an 8-hour workday." (604). Mack further stated: "[Patient's] depression hinders focus + causes some irritability/rigidity of her personality, impacting [the] above mentioned factors . . . full-time competitive employment could exacerbate . . . depression [secondary to] work stress." (604-605).

Exhibits 4F, 5F and 10F consist of treatment notes from Plaintiff's mental health therapy sessions at Unity Health System, where Plaintiff was seen by a series of therapists. (275-458, 482-541). Exhibits 4F and 5F cover the period of April 2010 through December 2012, though Plaintiff stopped attending appointments for one year within that period, between May 2011 (381) and May 2012 (388). Initially the focus of Plaintiff's treatment at Unity was her cannabis dependence, though her depression and anxiety were also addressed. As Plaintiff had success in abstaining from marijuana, the focus of the sessions turned more to her mental health symptoms. Moreover, Plaintiff initially sought treatment for anger management at the direction of the court (302), but

eventually, after being terminated as a patient for failing to attend appointments, re-initiated treatment on her own.

Between April 2010 and June 2010, Plaintiff was seen by Andrea Fedoruk, LCSW ("Fedoruk"). On April 12, 2010, at the start of treatment, Fedoruk noted that Plaintiff claimed to be very depressed, and exhibited a depressed mood and depressed/blunted affect. (310). Plaintiff also claimed to have poor concentration. (310). On May 18, 2010, Fedoruk reported that Plaintiff had completed necessary paperwork to allow her to fill prescriptions for Celexa and Trazodone. (316). Fedoruk noted that Plaintiff had a "more positive attitude," but still seemed depressed and irritable. (317).

On July 29, 2010, Plaintiff began treating with a new therapist at Unity, Penny McClure ("McClure"). That same day McClure conducted a mental status exam that was unremarkable except that Plaintiff had a "depressed" mood and affect. (323). On September 20, 2010, McClure reported that Plaintiff was having "stressors relating to remaining sober," as well as preoccupations, depressed mood and depressed affect. (328).

On October 14, 2010, McClure reported that Plaintiff had a "lifted mood compared to prior sessions" (333), with a "euthymic" mood and "normal" affect. (334). On October 27, 2010, McClure reported that Plaintiff was in a "good mood," with "euthymic" mood and "normal" affect. (339-340). On November 10, 2010, McClure noted that Plaintiff still had a "euthymic" mood and "normal" affect, despite having stopped taking medications because she was pregnant. (346). On December 20, 2010, Plaintiff told McClure that she as experiencing more anxiety since stopping the medications, and McClure noted that she had an anxious mood and normal affect. (351-352). On January 11, 2011,

Plaintiff reported being stressed and worn out from "running around and trying to keep busy to keep her mind off using" marijuana (357), and McClure reported that she had a depressed mood and affect. (358).

On March 18, 2011, Plaintiff began treating with a new Unity therapist, Wanda Ewer, LMSW ("Ewer"). (369). Plaintiff told Ewer that she "ha[d] stable living" and was "compliant with her medication." (369). Plaintiff further stated that she was taking classes to earn her GED and to obtain vocational training as a security guard. (369). Ewer reported that Plaintiff had a euthymic mood and normal affect, and noted that Plaintiff "was attentive and ready to work on her goals and objectives." (370).

On April 15, 2011, Unity therapist Jamie Lee Watt, MS ("Watt") reported that Plaintiff had a "euthymic mood and congruent affect," but was complaining of increased panic attacks, for which Watt suggested that she try breathing to calm herself. (377). On July 25, 2011, Watt reported that Unity was closing Plaintiff's file, because she had stopped attending appointments in May 2011. (380-381). Watt further noted that Plaintiff had expressed the need to smoke marijuana to calm down, and that her medications made her feel "a little agitated." (385).

A year later, Plaintiff returned to Unity for treatment and was seen by therapist Stephanie Catlin-Rakoski ("Catlin-Rakoski"). (388). On May 8, 2012, Plaintiff reportedly told Catlin-Rakoski that she was interested in obtaining her GED and studying to become a medical assistant. (396). That same day, Catlin-Rakoski conducted a mental status exam, and reported that Plaintiff had euthymic mood, normal affect, "helpless" thought process, and "tangential" thought form. (399). Plaintiff reportedly denied having any impairments with regard to activities of daily living. (399). On May 21, 2012, Plaintiff

reported having decreased attention, mild anxiety and decreased concentration. (389).

On or about June 8, 2012, Plaintiff began treating with Unity therapist Stephanie Dobbin, M.S. ("Dobbin"), at which time she told Dobbin that her depression symptoms consisted of low mood, lack of motivation, anhedonia, and suicidal thoughts. (402). Plaintiff further stated that she experienced anxiety in crowds and in enclosed spaces. (402). However, Plaintiff stated that she had abstained from marijuana for a year, and that she was motivated to receive mental health treatment. (402). Plaintiff also reiterated that she had no impairments in her activities of daily living. (404). On June 25, 2012, Plaintiff stated that her past choices had negatively affected her feelings of self worth, and that making "better, healthier choices" was having a positive impact on her mood and self-esteem. (406). On July 20, 2012, and August 3, 2012, Dobbin reported that Plaintiff had a normal mental status exam, including euthymic mood, normal affect, good insight and good judgment. (412, 418). On September 10, 2012, Plaintiff reported feeling sad, and stated that she was not taking her medication because of an insurance problem. (430). Dobbin noted that Plaintiff had a "depressed, irritable" mood and constricted affect. (430).

On October 16, 2012, Dobbin reported that Plaintiff's insurance was reinstated and that she was again taking her medications. (435). Dobbins reported a normal mental status exam. (436). During that day's session, Plaintiff and Dobbin discussed the prospect of Plaintiff returning to work, and Plaintiff expressed conflicted feelings, because she was worried that going back to work too soon might "lead her to act on irritable moods and lose her job or get into conflicts with others." (436). Plaintiff further stated that although she had applied for SSI benefits, she was thinking of withdrawing

the application  because she ultimately hoped to return to work. (436).  Nevertheless, that same day Dobbins completed a disability form for Plaintiff. (Exhibit 8F, 468-471). Dobbin indicated that she had met with Plaintiff on eight occasions during the previous year, and that Plaintiff's "chief complaints" were "depression [and] impulse anger control." (468).  More particularly, Dobbin's diagnostic impression was "major depressive disorder" and "dysthymic disorder." (470).  Dobbin reported that mental status examinations showed that plaintiff had a euthymic (though irritable) mood, a normal affect, good judgment and good insight. (469).  Significantly Dobbin indicated that Plaintiff would be "unable to function 10-25% of the time" in the following areas: Capacity to perform simple and complex tasks independently; capacity to maintain attention and concentration for rote tasks; and capacity to regularly attend to a routine and maintain a schedule. (470). Dobbin opined that Plaintiff would be unable to "unable to participate in any activities except treatment or rehabilitation" for a period of three months. (470).

On November 19, 2012, Plaintiff told Dobbin that she was "stressed" about finding a new apartment and about being in an out of the hospital relating to knee pain. (442). Dobbin noted that Plaintiff had a depressed mood and affect. (442).  On December 3, 2012, Plaintiff reported being upset, both because her welfare payments had been cut off, and because a family friend had been murdered. (448).  Nevertheless, Plaintiff claimed that she had resisted the urge to begin using drugs again, and had a desire to set a good example for her child. (448).  Dobbin reported that Plaintiff had a "depressed, irritable" mood, but an otherwise normal mental status exam. (448).

On December 11, 2012, Unity Nurse Practitioner Kathleen Calnan, NPP ("Calnan") conducted an evaluation. (281-293).  Calnan opined that Plaintiff's depression

was in "partial remission" with medication. (293).

On December 15, 2013, Plaintiff appeared depressed, tearful and angry while recounting an argument that she had with a social services representative. (483-484).

On January 20, 2013, Dobbin reported that Plaintiff appeared "calmer and more optimistic," and had expressed interest in pursuing a job, partly because her social services hearing had not gone well. (490). On January 31, 2013, Plaintiff "expressed much excitement about her upcoming wedding in August," and exhibited a euthymic mood and normal affect. (495). On February 28, 2013, Plaintiff was excited because she had been hired for the job that she was seeking, though she expressed some worry at the prospect of working full time. (499). However, Dobbin "express[ed] confidence in her ability to excel at her new job." (499, 504).

On March 12, 2013, Plaintiff was disappointed and sad because the employer had rescinded the job offer after conducting a background check; however, Plaintiff explained that she was able to improve her mood by focusing on the future, and that she had enrolled in classes to become a home health aide. (502). Dobbin praised Plaintiff's coping strategies and her "initiative in seeking employment." (502). On March 28, 2013, Plaintiff had a euthymic mood and normal affect, even though she was upset that a neighbor had recently been murdered. (508). Dobbin opined that Plaintiff was using good coping strategies. (508). On April 26, 2013, Dobbin noted that Plaintiff was "euthymic and future oriented," and had indicated that she was enjoying taking classes to obtain her GED  and to become trained in customer service. (515). Plaintiff also explained that she recently had been able to "manage her anxiety and frustration effectively" after having a minor car accident. (516). Plaintiff's mental status exam was

normal, with euthymic mood, normal affect and good judgment and insight. (516). On

May 10, 2013, Dobbin noted that Plaintiff was enjoying a job training class and had

"begun networking with teachers and administrators so that she can find a job." (520).

On June 7, 2013, Plaintiff was euthymic and told Dobbin that she had successfully

obtained a certificate for completing customer service training; Plaintiff also reflected on

"what it will be like when she has a full time job and can stop relying on DHS." (527-528).

On July 12, 2013, Plaintiff was euthymic and told Dobbin about job prospects.

(531). Dobbin indicated that Plaintiff had "made much progress in the last several

months," and no longer needed therapy sessions, but should continue to receive

medication. (532). On July 26, 2013, Dobbin had her last scheduled session with

Plaintiff, and reported a normal mental status exam. (536). Plaintiff indicated that she

had stopped smoking cigarettes and remained abstinent from all illegal substances, and

that she planned to have her GED by the year's end. (536). Almost a year later, on May

22, 2014, Dobbin wrote a discharge note for Plaintiff's file, indicating that Plaintiff had

"made great progress in therapy; she went from thinking about applying for SSI to taking

on a WEP assignment, obtaining her GED and initiating a job search. She reported an

improvement in her mood through therapy and med mgmt. She also remained clean and

sober during the treatment episode." (539-540). Dobbin noted, though, that Plaintiff had

stopped attending her medication appointments after September 2013, and was being

discharged from any further treatment at Unity. (540).

PROCEDURAL BACKGROUND

On October 31, 2012, Plaintiff filed her application for SSI benefits, claiming to

have become disabled on January 1, 2008. (129-134). Plaintiff indicated that her

disabling conditions were "depression, sleeping disorder, bursitis of the left hip." (152).

On January 18, 2013, non-treating psychologist Christine Ransom, Ph.D. ("Ransom") conducted a consultative psychiatric evaluation at the Commissioner's request. (Exhibit 7F, 463-466). Plaintiff reportedly told Ransom that she was

> having mood swings, crying spells, irritability, sudden changes in mood recently mostly low energy. She has wandering thoughts, difficulty concentrating. She does not want to be around her family or friends. She is currently sitting alone in her room all day watching television. She is not doing anything during the day when her child is at school. When the child comes home, she does take care of her needs. She denied generalized anxiety, panic attacks, manic symptomatology, currently thought disorder, cognitive symptoms and deficits. [sic]

(464).[2] Ransom noted that Plaintiff was oriented, and had normal thought processes, intact remote memory, average cognitive functioning and adequate insight. (465). Ransom concluded, though, that Plaintiff was "moderately impaired" with regard to attention, concentration and immediate memory. (465). Ransom's "medical source statement" was as follows:

> This individual can follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule and learn simple new tasks. She would have moderate difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress due to bipolar disorder, depressed phase, currently moderate. The results of the evaluation are consistent with the claimant's allegations.

---

[2] This recitation of symptoms by Plaintiff seems odd when juxtaposed with notes made by Dobbin at the very same time, indicating that Plaintiff was exhibiting significant improvement, had normal mental status exams and was excited about being hired for a new job. (490, 495).

(465).[3]

On February 15, 2013, agency medical consultant V. Reddy ("Reddy") completed a mental residual functional capacity report, which concluded that Plaintiff was capable of working. (Exhibit 1A, 64-72).  Reddy indicated that his report was based upon a review of records including Plaintiff's mental health treatment records from Unity and Ransom's consultative report. (65-66).  Reddy concluded, in pertinent part, that Plaintiff had severe mental impairments that limited her "simple work," or "unskilled work." (67, 71).  In opining that Plaintiff was able to work despite her mental impairments, Reddy concluded that Plaintiff had no restriction of her activities of daily living, mild difficulty with social functioning and moderate difficulty maintaining "concentration, persistence or pace." (68). More specifically, Reddy opined that Plaintiff was "moderately limited" with regard to understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, working in proximity to other people, completing a normal workday/workweek without interruptions from symptoms, interacting with the public, responding to criticism/direction from supervisors and responding to changes in the work setting. (69-70).

On October 20, 2014, Plaintiff testified before an Administrative Law Judge ("ALJ"), accompanied by her attorney. (26-62).  The ALJ also took testimony from a vocational expert ("VE").  During the hearing, Plaintiff testified that she was working

---

[3]Ransom's report also indicates, in different places, both that Plaintiff "is able to manage money" (465)  and that she "will need assistance managing funds." (466).  The latter observation appears to be a typo/boilerplate, and in any event there is no support for it in the record; to the contrary, as noted above Plaintiff repeatedly denied that she had any limitations in her activities of daily living.

"between 15 to 20 hours" per week as a retail associate, and that she enjoyed the work. (34-35). Plaintiff gave no indication that her non-exertional impairments hindered her ability to perform the job. Indeed, Plaintiff forthrightly acknowledged that she was able to perform tasks, such as placing orders using a computer, notwithstanding her alleged learning disability. (53). Plaintiff vaguely indicated that her mental health symptoms had been "kind of off balance" lately, which she attributed to the fact that she was no longer attending therapy sessions. (47). Plaintiff indicated that the reason she stopped attending therapy sessions at Unity was because Dobbin had taken a maternity leave, and no other therapists were acceptable to her. (47). The Court observes, however, that while Dobbin noted that she would be taking a maternity leave during August and September 2013, that is not the reason that Plaintiff's therapy sessions stopped. (536). Rather, as discussed above, Dobbin discharged Plaintiff from her therapy sessions, prior to such maternity leave, because she had met all of her treatment goals. Moreover, Dobbin indicated that she was returning from maternity leave in October 2013 (536), and, indeed, Dobbin wrote the final entry in Plaintiff's Unity chart in May 2014, noting that Plaintiff was being discharged from Unity because she had failed to attend her scheduled medication-monitoring appointments. (540).

On January 28, 2015, the ALJ issued a Decision, denying Plaintiff's SSI claim. (10-21). That is, the ALJ found that Plaintiff was not disabled at any time between the protective filing date of her application, October 31, 2012, and the date of his decision, January 28, 2015. Applying the familiar five-step sequential analysis used to evaluate disability claims, the ALJ found at the first, second and third steps, respectively, that Plaintiff had not engaged in substantial gainful activity, that she had severe impairments

consisting of left hip bursitis, migraines, bipolar disorder, marijuana dependence in remission and chondromalcia patella, and that none of those impairments were severe enough to meet or medically-equal a listed impairment. (12-14).  Prior to reaching the fourth step, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"): "Claimant has the [RFC] to perform light work . . .  except she can stand for forty-five minutes at [a] time before needing to sit briefly up to three minutes.  She is limited to performing simple routine tasks.  She can occasionally interact with coworkers and the general public." (14).  In discussing that determination, the RFC reviewed the medical evidence in some detail. (14-20).  The ALJ indicated that he gave "some weight" to Dobbin's report (Exhibit 8F) and "limited weight" to Mack's report (Exhibit 12F), but "great weight" to the reports by Ransom and Reddy. (17-20).  At step four of the sequential analysis the ALJ found that Plaintiff had no past relevant work, but at step five he found that Plaintiff could perform other jobs on a regular full-time basis, including laundry sorter and collator operator. (20-21).  Plaintiff appealed, but on April 29, 2016, the Appeals Council declined to review the ALJ's determination. (1-3).

On June 28, 2016, Plaintiff commenced this action.  On January 9, 2017, Plaintiff filed the subject motion [#7] for judgment on the pleadings, and on May 4, 2017, Defendant filed the subject cross-motion [#13] for judgment on the pleadings.  On May 18, 2017, counsel for the parties appeared before the undersigned for oral argument.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's

conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

DISCUSSION

Plaintiff contends that the ALJ erred in several respects, each of which the Court will consider below.

Application of the Treating Physician Rule

Plaintiff contends that the ALJ did not properly apply the treating physician rule, because he failed to give "good reasons" for "rejecting" Dr. Mack's opinion. In particular, Plaintiff states:

> Here, the ALJ gave three reasons for his rejection of Dr. Mack's treating source statement. First, the ALJ reasoned in boilerplate fashion that it was "generally inconsistent with the overall medical evidence of record. Second, the ALJ argued that it was inconsistent with Ms. Griffin's own statements about her work activities. Finally, the ALJ found tension between Dr. Mack's opinion[,] that [Plaintiff] had a good prognosis and would likely never be absent from work as a result of her impairments or treatment[, and] the rest of his assessments. . . . [N]one of these can amount to "good reasons" for giving "limited weight" to Dr. Mack's treating medical source statement.

Pl. Memo of Law [#7-1] at p. 22 (citation to record omitted). Plaintiff maintains that the ALJ's "boilerplate" assertion that Mack's opinion is "generally inconsistent with the overall medical evidence" is not a "good reason," since it is vague and fails to identify the evidence that is supposedly inconsistent with Mack's opinion.[4] Plaintiff also insists that

---

[4]Pl. Memo of Law [#7-1] at p. 23.

Mack's opinion is actually consistent with the other evidence from treating sources. Plaintiff further asserts that the ALJ's contention, that her statements about her own work activities are inconsistent with Mack's opinion, is not a "good reason," since he does not identify the allegedly-inconsistent statements.[5] Additionally, Plaintiff contends that the ALJ's assertion that Mack's opinion is internally inconsistent is not a "good reason" to reject the opinion, since Mack's opinion is actually not internally inconsistent. In particular, Plaintiff argues that there is no inconsistency between Mack's opinions that Plaintiff's prognosis is good and that she would likely never be absent from work, and his opinion that Plaintiff lacks the mental abilities to adequately perform full-time work.[6]

Defendant counters that the ALJ gave good reasons for the weight that he assigned to Mack's opinion.[7] In this regard, Defendant argues that viewed as a whole, the ALJ's discussion of the evidence illustrates why Mack's statements about Plaintiff's mental abilities are not consistent with Mack's own progress notes or with the other evidence in the record.[8] Defendant also argues that Plaintiff's statements conflict with Mack's report and support the ALJ's RFC determination.[9]

In considering whether the ALJ properly applied the treating physician rule, the applicable legal principles are clear:

---

[5]Pl. Memo of Law [#7-1] at p. 24.

[6]Pl. Memo of Law [#7-1] at pp. 25-26.

[7]Def. Memo of Law [#13] at pp. 27-29.

[8]Defendant contends that this analysis by the ALJ took place on pages 15-20 of the record, which comprises the ALJ's entire discussion of all of the medical evidence in the case.

[9]Def. Memo of Law [#13] at p. 29.

> Pursuant to the 'treating physician rule,' [a treating source's] opinion as to the nature and severity of [the claimant's] impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. [T]he opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts. If a treating physician's opinion is not afforded controlling weight, the ALJ must consider certain factors to determine how much weight to give it, and should articulate 'good reasons' for the weight given.

*Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (citations omitted). However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [a reviewing court] to glean the rationale of an ALJ's decision." *Cichocki v. Astrue*, 729 F.3d 172, 178 n. 3 (2d Cir. 2013) (citation omitted).

Preliminarily, the Court agrees with Plaintiff that Mack's opinions, that Plaintiff's prognosis is good and that she would likely never miss work, are not *necessarily* inconsistent with his opinions concerning Plaintiff's limited ability to maintain attention and concentration. For example, it is clearly possible that a claimant could show up for work everyday, but lack the physical or mental ability to perform the job. Accordingly, to the extent that the ALJ gave only limited weight to Mack's opinion because it was supposedly internally inconsistent in those regards, the ALJ failed to provide a "good reason."

However, the other reasons that the ALJ gave for assigning only limited weight to Mack's opinion are both "good" and supported by substantial evidence. In particular, as the discussion of the record above indicates, there is substantial evidence to support the

19

ALJ's finding that the restrictive limitations which Mack placed on Plaintiff's mental capacity to work are inconsistent with much of the evidence, as well as with Plaintiff's own statements about her work activities.[10]  For example, Dobbin, who saw Plaintiff far more often than Mack, encouraged Plaintiff's plans to pursue full-time work, and expressed confidence that Plaintiff could succeed. (499, 502, 504, 520).  (Although Dobbin had previously given a more-restrictive opinion concerning Plaintiff's work abilities, that had been in 2012, when Plaintiff had just begun treatment with Dobbin.).  Moreover, neither Mack's report, which is dated October 1, 2014, nor his office notes from that period, give any indication that he was aware that Plaintiff had successfully completed her treatment at Unity or that she was already employed part-time.

Plaintiff nevertheless argues that the ALJ failed to provide "some specific notation to what specific medical evidence Dr. Mack's opinion was allegedly in conflict with."[11]  The Court, though, disagrees and finds that the ALJ's rationale is evident from the decision; in particular, the ALJ's statement on page 19 of the record, which Plaintiff says is insufficient, must be viewed in context with, and is really a summation of, his accurately-detailed, four-page discussion of the mental health treatment records. (16-19).

The Court similarly finds that the ALJ's decision adequately explains why he found that Plaintiff's statements about her activities were inconsistent with, and detracted from the weight given to, Mack's report.  On the other hand, when Plaintiff attempts to explain

---

[10]Although the ALJ did not say so, the Court would add that Mack's report also seems unsupported by his own office notes.  Having reviewed all of the notes by Mack and Morehouse, it is unclear to the Court what information Mack was relying upon when he completed the mental portion of the subject report, or how he chose the particular percentages that he indicated.(603-604).

[11]Pl. Memo of Law [#7-1] at p. 23.

how her statements about her work activities are actually consistent with Mack's report, she offers no example pertaining to her non-exertional impairments, but instead, abruptly switches the focus to her physical complaints.[12]

In sum, the Court finds that Plaintiff's argument on this point lacks merit.

Evidentiary Support for the RFC Finding

Plaintiff next contends that the ALJ's RFC determination is erroneous, since it is based upon the opinions of Ransom and Reddy, which are not substantial evidence. For example, Plaintiff asserts that Ransom's opinion is internally inconsistent in two respects: First, it indicates that Plaintiff would be able to maintain concentration and perform simple tasks, even though she had difficulty performing simple calculations and remembering objects and numbers; and second, it indicates that Plaintiff can work, while simultaneously indicating that the opinion is "consistent with [her] allegations." Plaintiff argues that the ALJ should have addressed these alleged inconsistencies.

Plaintiff similarly contends that Reddy's opinion fails to provide substantial evidence to support the RFC finding, because Reddy never examined Plaintiff, and because Reddy's report is too vague. With regard to vagueness, Plaintiff asserts that Reddy's report failed to explain "what areas Ms. Griffin was limited in."[13]

Defendant counters that the ALJ properly relied on the opinions from Ransom and Reddy. In this regard, Defendant first points out that as a general matter, ALJs may rely

---

[12]Pl. Memo of Law [#7-1] at p. 24. As previously noted, the Court believes that the record contains more than sufficient evidence to support the ALJ's determination that Plaintiff has physical capacity to work. Mack even commented that Plaintiff's mental impairments were more serious than her physical issues. (249) ("She brings in DHS work determination form. Her only physical limitation is due to L hip pains she has been having; larger limits are 2/2 [secondary to] mental health.").

[13]Pl. Memo of Law [#7-1] at p. 28.

on the opinions of examining and non-examining consultants as substantial evidence.[14] Defendant further contends that Ransom's opinion supports the ALJ's RFC finding, even though Ransom found Plaintiff's attention, concentration and memory to be moderately impaired.[15] Lastly, Defendant asserts that Reddy's opinion is "consistent with the record as a whole."[16]

The Court agrees with Defendant, and disagrees with Plaintiff, concerning alleged inconsistencies in Ransom's opinion. The Court agrees, for example, that Ransom's statement that Plaintiff can perform "simple tasks," but would have moderate difficulty performing "complex tasks," is consistent with her findings that Plaintiff had moderate difficulty on tests of attention, concentration and memory. Plaintiff seems to argue that any claimant who exhibits moderate limitations in such areas must necessarily be found disabled, but the Court does not agree. *See, e.g., Eby v. Colvin*, No. 15-CV-6543L, --- F.Supp.3d --- , 2017 WL 24087, at *3 (W.D.N.Y. Jan. 3, 2017) ("The RFC determined by the ALJ, which limits plaintiff to performing low-stress, goal-oriented work (and not production pace work), involving only simple tasks, adequately accounts for plaintiff's moderate limitations in attention and concentration.") (citation omitted). Nor does the Court believe that Ransom's opinion -- that Plaintiff can work at simple jobs -- is inconsistent with her statement that "[t]he results of the evaluation [were] consistent with the claimant's allegations." Rather, Ransom evidently believed that Plaintiff was capable of simple work notwithstanding her complaints.

---

[14]Def. Memo of Law [#13] at p. 30.

[15]Def. Memo of Law [#13] at pp. 30-31.

[16]Def. Memo of Law [#13] at p. 31.

As for Reddy's opinion, Defendant is correct that ALJs may, in proper cases, give more weight to the opinion of a non-examining consultant than to the opinion of treating physician. *See, Camille v. Colvin*, 652 F. App'x at 28 (*citing Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) for the proposition that "[t]he regulations ... permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.").  Here, based upon the evidence discussed above and in the ALJ's decision, the ALJ was entitled to find that Reddy's report was more consistent with the evidence than Mack's.  Moreover, the Court does not agree with Plaintiff's contention that Reddy's report fails to specify the areas in which the Plaintiff was limited.  To the contrary, as noted earlier, the report details the limitations that Reddy believed Plaintiff had in specific areas affecting work ability. (68-70).

CONCLUSION

Plaintiff's application for judgment on the pleadings [#7] is denied, and Defendant's cross-motion [#13] for judgment on the pleadings is granted.  The action is dismissed.

So Ordered.

Dated: Rochester, New York                    ENTER:
      June 2, 2017


                                   /s/ Charles J. Siragusa
                                   CHARLES J. SIRAGUSA
                                   United States District Judge